**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| STEPHANIE PATRICE O'CONNOR, | CASE NO. 1:22-CV-00693-AMK |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

Plaintiff Stephanie Patrice O'Connor ("Plaintiff" or "Ms. O'Connor") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 7.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On December 17, 2018, Ms. O'Connor filed an application for DIB.  (Tr. 305-06.)  She alleged a disability onset date of September 28, 2018.  (Tr. 305.)  She alleged disability due to rheumatoid arthritis, widespread joint pain and swelling, anxiety, and hypothyroidism.  (Tr. 130.)  Ms. O'Connor's application was denied at the initial level (Tr. 129-42) and upon reconsideration (Tr. 144-54), and she requested a hearing (Tr. 201-02).  On February 11, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 77-108.)  On April 6, 2020, the ALJ issued an unfavorable decision (Tr. 157-76), which was remanded by the Appeals Council on

1

September 24, 2020 (Tr. 177-80).  Ms. O'Connor had a second hearing before an ALJ on

January 19, 2021 (Tr. 44-68), and the ALJ issued an unfavorable decision on February 12, 2021

(Tr. 14-39).  The February 12, 2021 decision was affirmed by the Appeals Council on March 4,

2022, making it the final decision of the Commissioner.  (Tr. 1-3.)  Ms. O'Connor then filed the

pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 6, 8, 9, 10).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. O'Connor was born in 1966 and was 53 years old on the date last insured, making

her an individual closely approaching advanced age under Social Security regulations.  (Tr. 32.)

She had at least a high school education.  (*Id*.)  Ms. O'Connor had not engaged in substantial

gainful activity since September 28, 2018, the alleged onset date.  (Tr. 20.)

### B.     Medical Evidence

Although Ms. O'Connor has physical and mental impairments that were identified by the

ALJ (Tr. 20), she primarily challenges the ALJ's decision as to her metatarsalgia / plantar

fasciitis, fibromyalgia ("FM"), rheumatoid arthritis ("RA"), and anxiety, and the state agency

medical opinions (ECF Doc. 6, pp. 17, 20, 21, 23).  The evidence summarized herein is

according focused on the evidence pertaining to those impairments and opinions.

#### 1.     Relevant Treatment History

Ms. O'Connor attended a podiatry appointment with Nathaniel Hamm, DPM, on October

23, 2018, complaining of pain around the metatarsophalangeal joints ("MPJs") in both feet,

worse with walking.  (Tr. 445.)  She reported previous injections in the second interspace of both

feet that resulted in 90% pain relief and requested repeat injections; she explained the pain had

returned to 8/10 because she had been more active on both feet.  (*Id.*)  On examination, her skin

temperature was warm, with hair growth and no localized erythema or calor, but with edema overlying the MPJs bilaterally.  (*Id.*)  Dr. Hamm noted intact sensation bilaterally, but with pain in the bilateral third interspace, worse with compression of the metatarsal heads.  (*Id.*)  The MPJs were painful with range of motion, worse with maximum dorsiflexion, but with no crepitus noted.  (*Id.*)  The Lachmann test was negative.  (*Id.*)  Pain to the left second interspace was improved, but the right was more severe.  (*Id.*)  Muscle strength was 5/5 for all lower extremity muscle groups bilaterally, and the bilateral ankle joints had full range of motion without pain or crepitus.  (*Id.*)  Dr. Hamm diagnosed bilateral neuroma, bilateral foot pain, fibromyalgia, and rheumatoid arthritis ("RA").  (*Id*.)  Dr. Hamm administered injections of 1:1:1 dex, Kenalog, and marcaine in the second interspace of both feet, which were tolerated well.  (Tr. 445-46.)

Ms. O'Connor presented to rheumatologist Maria Antonelli, M.D., on November 20, 2018, reporting a remote 2011 diagnosis of RA with swelling in feet and hands, positive rheumatoid factor ("RF") testing, and elevated inflammatory markers.  (Tr. 476-78.)  She had previously treated with Actemra, Orencia, Xeljanz, Plaquenil, methotrexate, Humira, and steroids, but had been off RA medications for two years.  (Tr. 476.)  She reported fatigue with joint pain in her ankles, feet, hands, and wrists, worst in the morning.  (Tr. 476-77.)  She reported a recent move to a one-floor apartment to avoid stairs.  (Tr. 477.)  On examination, Ms. O'Connor demonstrated full range of motion, stable gait, and 5/5 grip strength with no swelling, warmth, effusion, or erythema in the shoulders, elbows, wrists, hands, knees, or ankles; however, Dr. Antonelli noted allodynia, tender elbows and hands, mild synovial thickening in three proximal interphalangeal ("PIP") joints of her right hand and two metacarpophalangeal ("MCP") joints of her left hand, and very tender metatarsophalangeal ("MTP") joints in her toes.  (Tr. 477-78.)  She diagnosed seropositive RA, with some features of active RA (like mild synovitis), but

3

told Ms. O'Connor her fibromyalgia ("FMS") / chronic fatigue caused her predominant symptoms and that RA treatments would not fix her symptoms 100%. (Tr. 478.) Dr. Antonelli prescribed Plaquenil and gabapentin and recommended follow up in three to four months. (*Id.*)

Ms. O'Connor returned to her podiatrist, Dr. Hamm, on December 18, 2018; she continued to complain of bilateral foot pain, now with the left foot worse than the right. (Tr. 443.) Her examination findings and diagnoses were the same. (*Compare* Tr. 443 *with* Tr. 445.) Dr. Hamm noted physical offloading of the neuroma and that the steroid injections had failed; he ordered an MRI. (Tr. 443.) If the MRI confirmed a neuroma, Dr. Hamm discussed the risks and benefits of treatment via sclerosing agent injection or surgical intervention, recommending the sclerosing injection because it would reduce the post operative risks associated with her RA and possible immunosuppression. (Tr. 443-44.) He instructed Ms. O'Connor to follow up after her MRI. (Tr. 444.)

A January 4, 2019 MRI of Ms. O'Connor's left forefoot revealed a large Morton's neuroma within the third interspace measuring 2.2 cm in the plantar dorsal dimension by 1.5 cm in right to left dimension. (Tr. 455.) There was also a mild hallux valgus and mild osteoarthritis, but all other findings were normal and unremarkable. (*Id.*)

Ms. O'Connor returned to podiatrist Dr. Hamm on February 19, 2019, complaining of continued pain in both feet, worse on the left; she indicated she had tried previous steroid injections on the left with no long-term relief. (Tr. 545.) Her physical examination findings and diagnoses remained the same as her prior visit. (*Compare* Tr. 545 *with* Tr. 443.) Her left foot was injected with 6% alcohol sclerosing agent to the left second and third interspace, which she tolerated well. (Tr. 546.) Her right foot was less painful, and was injected with 1:1:1 dex, Kenalog, and marcaine; she felt relief in the office and tolerated the injection well. (*Id.*)

On February 26, 2019, Ms. O'Connor attended a new patient visit with Brendan Astley, M.D., for pain management.  (Tr. 468-71.)  Her main complaints were fibromyalgia and chronic fatigue, with pain in the lumbar spine, hips, knees, hands, and wrists which she described as sharp, dull, and disabling.  (Tr. 468.)  She reported an RA diagnosis and past use of autoimmune agents without relief, and said her new rheumatology provider believed most of her issues were due to fibromyalgia.  (*Id.*)  Her neurological and sensory examination findings were normal, and she demonstrated normal motor strength, fine motor coordination, and gait.  (*Id.*)  Her cervical spine was mildly tender to palpation and mildly painful with flexion and extension, and her lumbar spine was moderately tender to palpation and mildly painful on extension.  (*Id.*)  Ms. O'Connor reported: she could stand, sit, or walk for less than five minutes; her pain was seven on a ten-point scale, and would range between four and ten on a ten-point scale; and she had problems sleeping due to pain.  (Tr. 469.)  She complained of malaise/fatigue, leg swelling, back, joint, and neck pain, weakness, and depression and memory loss.  (Tr. 470.)  Dr. Astley diagnosed FMS and chronic pain syndrome and recommended pool therapy, smoking cessation, weight control, physical therapy, x-rays of hands and knees, rehab psychiatry, a Con580 PKKL infusion, and trigger point injections. (Tr. 468-69, 474.)  Ms. O'Connor declined trigger point injections because she had them before with no substantial relief.  (Tr. 469.)  Dr. Astley increased her Topamax to 25mg and planned the procedure for the PKKL infusion.  (*Id.*)

Ms. O'Connor saw podiatrist Dr. Hamm for foot injections on February 26, March 4, April 3, April 10, April 17, May 14, May 28, and July 17, 2019.  (*See* Tr. 531-44, 567-68.)  Her examination findings remained consistent with her prior visits, including warm skin temperature, hair growth, no localized erythema or calor, intact sensation, 5/5 muscle strength, full range of motion in the ankles without pain or crepitus, but with edema overlying the MPJs bilaterally,

pain in the bilateral third interspace worse with compression of the metatarsal heads, and pain with range of motion in the MPJs, worse with maximum dorsiflexion.  (*Id.*)  Her diagnoses also remained the same.  (*Id.*)  On February 26, 2019 visit, Dr. Hamm administered a sclerosing agent injection in both feet, which Ms. O'Connor tolerated well.  (Tr. 544.)  Thereafter, Dr. Hamm administered a sclerosing agent injection in the left foot only.  (Tr. 532, 534, 536, 538, 540, 542, 568.)  At the March 4 and April 17, 2019 visits, Ms. O'Connor noted she was going on a three-week vacation, and would follow up for further treatment on her return.  (Tr. 535-36, 541-42.)  At the July 17, 2019 visit, she reported "a significant decrease in pain around 50%" in her left foot since her initial visit.  (Tr. 567.)  She was instructed to return in one week for a repeat injection, but the record indicates she did not return until 2020.  (Tr. 584-85.)

At an April 2, 2019 rheumatology visit with Dr. Antonelli (Tr. 484-88), Ms. O'Connor reported her hands were killing her, worse in the morning (Tr. 485).  She was doing some water therapy, seeing psychiatric rehab, and had started Topamax, which helped some; but Plaquenil did not help.  (*Id.*)  Physical examination findings were largely unremarkable, with an "ok" gait and full range of motion with no effusion, swelling, warmth, or erythema to the joints, but with allodynia to the non-articular areas in her fingers, tender elbows, very tender MTPs to squeeze, and mild synovial thickening to three PIPs on the right hand and two MCPs on the left hand.  (Tr. 486.)  Dr. Antonelli ordered lab testing and an MRI of the left hand, and instructed Ms. O'Connor to continue Plaquenil and pain management for her FMS treatment; they discussed methotrexate as the next step.  (*Id.*)  Ms. O'Connor was advised to return in six months.  (*Id.*)

On November 7, 2019, Ms. O'Connor attended a primary care visit with Geetu Pahlajani, M.D., for hypothyroidism, FM maintenance, hand pain, and cold symptoms.  (Tr. 609-13.)  She reported that Cymbalta helped her leg symptoms from FM, but that she was still experiencing

anxiety; she was scheduled to meet with a psychiatrist regarding her anxiety the next day.  (Tr. 609.)  She reported trouble gripping, holding, and squeezing with her hands, with her right wrist pain worse than her left; her friend gave her a brace that provided some relief.  (*Id.*)  She had not filled her rheumatologist's referral for an MRI because her insurance would not cover it.  (*Id.*)  Her physical examination findings were unremarkable.  (Tr. 611.)  Dr. Pahlajani continued Cymbalta for FM, finding the condition was improving with medication, and ordered an EMG for hand pain.  (Tr. 612.)  EMG test results from December 18, 2019 were normal and revealed no neuropathy or radiculopathy.  (Tr. 620-22.)

On November 8, 2019, Ms. O'Connor attended a new patient visit with psychiatrist Aasis Syed, M.D.  (Tr. 588-94.)  She complained her activities were limited by pain, and that she had suffered severe anxiety in social situations since age 19.  (Tr. 588.)  She reported rare use of lorazepam (prescribed by her rheumatologist) and said she was well-maintained on Lexapro from 1999-2019, when her primary care provider changed her to Cymbalta.  (*Id.*)  She denied feeling depressed or anxious on a regular daily basis, and said she only suffered from panic attacks in social situations; Dr. Syed believed it likely her depression and anxiety symptoms were in remission on her current antidepressant.  (*Id.*)  Ms. O'Connor reported that she was limited in many physical activities because of pain and fatigue, but that she was able to swim three times per week for thirty minutes.  (Tr. 589.)  Ms. O'Connor described her panic attacks as racing heart, numbness, head swirls, hearing loss, passing out, vomiting, and needing to go to the restroom for a bowel movement.  (*Id.*)  She said these episodes lasted for ten or fifteen minutes, and that she last had one the previous winter.  (*Id.*)  She said she avoided many situations where she might have a panic attack, such as when driving or at malls, movie theaters, or public events; she relied on others to drive her.  (*Id.*)  Ms. O'Connor's mental status examination findings were

7

unremarkable.  (Tr. 592.)  Dr. Syed opined that Ms. O'Connor was minimizing and suppressing

her anxiety and depressive symptoms, and that she would benefit from psychotherapy for her

past trauma.  (Tr. 591.)  He did not believe her panic attacks were neurological issues or seizures,

and noted that they responded well to lorazepam; he agreed she should not drive if panic attacks

were causing her to pass out.  (*Id.*)  He also indicated she was in severe pain from RA, but was

"on no pain meds yet"; she indicated Cymbalta was helping.  (*Id.*)  He diagnosed panic disorder

with agoraphobia, prescribed lorazepam for panic attacks, increased Cymbalta for anxiety and

chronic pain, and indicated Ms. O'Connor would benefit from psychotherapy.  (Tr. 593.)

Ms. O'Connor returned to podiatrist Dr. Hamm on January 2, 2020, over five months

after her last visit foot injection.  (Tr. 584-85.)  She reported that her left foot pain had resolved

at the last encounter in July 2019, but that similar pain had returned over the past two weeks; she

also reported right foot pain.  (Tr. 584.)   Ms. O'Connor's examination findings and diagnoses

were the same as prior visits.  (*Compare* Tr. 584 *with* Tr. 567.)  Dr. Hamm administered

injections of 1:1:1 dex, Kenalog, and Marcaine to both feet.  (Tr. 585.)

### 2.    Opinion Evidence

#### i.    Treating Provider Opinions

Nathaniel Hamm, DPM

Podiatrist Nathaniel Hamm, DPM, completed a medical source statement on March 29,

2018.  (Tr. 437-40.)  He noted a diagnosis of bilateral neuroma, unchanged throughout treatment,

with aching, throbbing pain reported in the web spaces of Ms. O'Connor's left and right foot.

(Tr. 439.)  X-ray and MRI imaging showed a two-centimeter neuroma on the left foot. (*Id.*)  A

sclerosing agent injection was planned, with surgical intervention to be considered "if

recalcitrant."  (*Id.*)  Ms. O'Connor was noted to be on oral prednisone for her rheumatoid

arthritis; she had attempted, but failed, a steroid injection.  (Tr. 440.)  Dr. Hamm opined that Ms. O'Connor's impairments: limited her standing, walking, and bending; created an unstable gait due to pain; and created numbness in the toes which may limit ambulation.  (*Id.*)

Dr. Hamm completed another questionnaire on May 22, 2019, now listing Ms. O'Connor's diagnoses as Morton's neuroma in the left foot and RA.  (Tr. 529.)  He indicated that she experienced nerve symptoms in her left foot, and shooting and burning pain, improving with serial alcohol sclerosing injections.  (*Id.*)  Clinical findings noted by Dr. Hamm included: positive Mulder's sign; pain in pan-metatarsal head and with MPT range of motion in foot; and diffuse metatarsalgia.  (Tr. 529.)  Dr. Hamm opined that Ms. O'Connor's impairments did not impose any limitations on her ability to perform sustained work activity.  (Tr. 530.)

Maria Antonelli, M.D.

On November 20, 2018, rheumatologist Maria Antonelli, M.D., completed a medical source questionnaire.  (Tr. 461-62.)  She noted Ms. O'Connor was diagnosed with RA in 2011, and her current diagnoses included fibromyalgia and "possible active [RA]."  (Tr. 461.)  Pertinent findings on clinical examination included mild synovial thickening in five finger joints and allodynia, with a normal neurological examination.  (*Id.*)  Diagnostic findings included anti-cyclic citrullinated peptide ("CCP") of 225 and an RF of 575.  (*Id.*)  Dr. Antonelli noted no required surgical or clinical interventions, and no plans for such treatment.  (*Id.*)  Ms. O'Connor had just started Plaquenil in November 2018, and had not yet been seen back; she could not tolerate gabapentin.  (Tr. 462.)  When asked to describe any limitations Ms. O'Connor's impairments imposed on her ability to perform sustained work activity, Dr. Antonelli noted she reported limited fine motor skills of grasping, pushing, and pulling, but that her neurological examination findings were benign.  (*Id.*)

9

<u>Randall Baenen, Ph.D.</u>

Clinical psychologist Randall Baenen, Ph.D., wrote a letter dated August 5, 2019, to primary care provider Dr. Pahlajani.  (Tr. 571.)  He indicated Ms. O'Connor struggled with a longstanding severe anxiety disorder with episodic panic attacks, which included "the rare occasional outcome of passing out and vomiting."  (*Id.*)  As a result, Dr. Baenen reported Ms. O'Connor avoided driving (except local roads), concerts, sporting events, and crowded restaurants.  (*Id.*)  He noted Ms. O'Connor had been on several SSRIs without therapeutic effect, and advised of his recommendation that Ms. O'Connor consult with Dr. Pahlajani regarding changing medications, "potentially aided by genetic testing to identify SSRIs most likely to benefit her."  (*Id.*)  Dr. Baenen advised that traditional cognitive behavioral therapy would not be effective until Ms. O'Connor's anxiety was better managed.  (*Id.*)

On October 14, 2019, Dr. Baenen wrote a letter to psychiatrist Aasia Syed, M.D., advising that he had met with Ms. O'Connor twice to explore her anxiety disorder.  (Tr. 573-74.)  He again noted that Ms. O'Connor struggled with anxiety disorder with panic attacks, with the significant complicating issue that her panic episodes routinely resulted in fainting and/or vomiting.  (Tr. 573.)  Because fainting or vomiting could cause "potentially catastrophic" consequences in certain circumstances—like while driving—Dr. Baenen indicated traditional cognitive behavioral therapies would be difficult "as they on predicated on the premise that the attacks are uncomfortable but otherwise safe."  (*Id.*)  In light of these symptoms, he also noted concerns for a seizure or other neurological condition triggered by extreme anxiety.  (*Id.*)  He noted Ms. O'Connor's past trials of Lexapro (helpful for a period of time) and Paxil (not helpful), and Ms. O'Connor's hope that genetic testing could help guide her choice of

psychotropic medication.  (Tr. 574.)  He indicated that he would meet with Ms. O'Connor as necessary, but that he believed medication management to be the next step in her treatment.  (*Id.*)

### ii.      State Agency Reviewers

On April 24, 2019, state agency medical consultant Gail Mutchler, M.D., issued an administrative medical finding that Ms. O'Connor was able to perform light work with additional limitations.  (Tr. 140.)  She could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could occasionally balance, kneel, stoop, crouch, and crawl; could perform frequent bilateral handling and fingering; could never operate foot controls; could never be required to operate a motor vehicle during the course of a workday; was restricted from hazards, such as heights or machinery but could avoid ordinary hazards in the workplace; and must avoid concentrated exposure to extreme heat, extreme cold, and humidity.  (*Id.*)

On July 3, 2019, state agency medical consultant Mehr Siddiqui, M.D., affirmed Dr. Mutchler's RFC findings.  (Tr. 152.)

## C.      Hearing Testimony

### 1.      Plaintiff's Testimony

#### i.      February 11, 2020 Hearing

At her February 11, 2020 hearing, Ms. O'Connor testified that she was 53 years old and lived in a condo with her husband.  (Tr. 84-85.)  Since her prior disability hearing in 2018, she said Cymbalta had helped with some of the electrical impulse feelings in her legs caused by fibromyalgia, but did not help with her joints or foot issues.  (Tr. 85-86.)  She said her anxiety and panic attacks had gotten worse since 2018, but noted that she had them since she was 18 or 19 years old.  (Tr. 86.)  Her panic attacks were triggered by feeling trapped or large gatherings, like concerts, crowds, big venues, big arenas, and big stores.  (Tr. 87.)  She described a panic

11

attack four years prior when she was driving and could barely get through an intersection, and later collapsed on the ground.  (Tr. 90.)  Although she still drove, she took circuitous routes and back roads to avoid traffic.  (Tr. 92-93, 97-98.)

Ms. O'Connor explained that she had seen a psychologist twice about her panic attacks, but he felt he could not help her because he could not promise her that nothing bad would happen if she passed out; instead, he said she should see a psychiatrist.  (Tr. 91.)  She then saw a psychiatrist, who doubled her Cymbalta but still cautioned her not to drive until after she had gone through intensive talk therapy.  (*Id.*)  She reported having difficulty attending her daughter's college graduation four years prior.  (Tr. 93-94.)

Ms. O'Connor also complained of pain in her hands, feet, knees and joints, rating her pain at six or seven on a ten-point-scale on a typical day.  (Tr. 94.)  The pain in her hands worsened with manipulating her hands and carrying things.  (Tr. 94-95.)  She had difficulty with pulling clothing up or off, pulling bed sheets off a bed, and buttoning pants.  (Tr. 97.)  She also complained of pain walking due to her neuroma, explaining that the neuroma in her foot bones would flare up after she did any significant walking.  (Tr. 95-96.)  She tried Naproxen for pain, and sometimes took her husband's steroids, which helped a little bit.  (Tr. 96.)

### ii.    January 19, 2021 Hearing

At her January 19, 2021 hearing, Ms. O'Connor testified that she was 54 years old, she graduated high school, and had some college.  (Tr. 49.)  She testified that her health had worsened since her 2020 hearing.  (*Id.*)  Since early-2020, she had developed a neuroma in her left foot, which ultimately required surgery.  (Tr. 50.)  The surgery did not heal as well as expected and her podiatrist explained that scar tissue had likely built up, causing continual pain in her left foot; he told her it was possibly a sunk neuroma, the neuroma growing back, or

12

another neuroma forming.  (*Id.*)  Even though the nerve was no longer there, Ms. O'Connor testified to constant stabbing pain, even when she was not bearing weight.  (Tr. 50-51.) Treatments, including steroid injections, had not relieved the pain.  (Tr. 51.)  Ms. O'Connor said she received the most relief from elevating her foot and placing an ice pack in her sock.  (*Id.*)

Ms. O'Connor had also received injections for carpal tunnel syndrome in her wrists, but said they did not help. (Tr. 52.)  She wore gloves on her wrists to help with symptoms and keep her muscles and tendons from tightening up.  (*Id.*)  She reported waking in the morning with her hands balled up into fists.  (*Id.*)  She was prescribed Lyrica and gabapentin, but had bad side effects with both medications.  (*Id.*)  She had difficulty using a keyboard and was able to type on her Kindle for tasks such as paying bills online, but not to write documents.  (Tr. 58.)

Ms. O'Connor was also receiving mental health treatment for panic disorder, including medication management and treatment with a psychotherapist.  (Tr. 53.)  She was prescribed lorazepam and Cymbalta, and said lorazepam helped when her anxiety was high.  (*Id.*)  She was having difficulty in behavior modification therapy and told her therapist she was unwilling to do therapy with driving because she would shake and have vision loss.  (Tr. 53-54.)

Ms. O'Connor said she could stand and prepare food for five or ten minutes, and would generally prepare food while sitting at the kitchen table with her foot propped up on a stool.  (Tr. 54.)  She could take care of her daily hygiene and minor chores—brushing teeth, putting her hair in a ponytail, getting dressed, or tidying up—but would need to lay down for an hour or more after completing these tasks.  (Tr. 56.)  If she stood for ten minutes, she needed to rest for about fifteen minutes.  (Tr. 54.)  She did not think herself capable of sustaining a full eight hours of sitting and standing; after three hours, she said she needed to lay down and rest due to fatigue. (Tr. 55.)  She became fatigued due to foot pain and fibromyalgia, which caused a cycle of muscle

tension and nerve pain.  (*Id.*)  She had a prescription for prednisone but did not like to take it regularly because she would put on weight due to inactivity.  (Tr. 57.)  She also experienced side effects of mental health issues and irritability while on prednisone.  (Tr. 57-58.)  She also testified her rheumatologist did not want her on prednisone long-term.  (Tr. 58.)

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age, education, and work experience with the functional limitations described in the ALJ's RFC determination could not perform Ms. O'Connor's prior work, but could perform representative positions in the national economy, like marker, office helper, or routing clerk.  (Tr. 60-61, 64.)

### III.  Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must
        be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a
        severe impairment that has lasted or is expected to last for a continuous
        period of at least twelve months, and his impairment meets or equals a listed
        impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must
        assess the claimant's residual functional capacity and use it to determine if
        the claimant's impairment prevents him from doing past relevant work.  If
        the claimant's impairment does not prevent him from doing his past relevant
        work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if,
        based on his vocational factors and residual functional capacity, he is
        capable of performing other work that exists in significant numbers in the
        national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L.

Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in

the national economy.  *Id.*

### IV.      The ALJ's Decision

In his September 1, 2020 decision, the ALJ made the following findings:[1]

1.      The claimant last met the insured status requirements of the Social Security
        Act on December 31, 2019.  (Tr. 20.)

2.      The claimant did not engage in substantial gainful activity from the alleged
        onset date of September 28, 2018, through the date last insured.  (*Id.*)

3.      The claimant has the following severe impairments: metatarsalgia/plantar
        fasciitis; fibromyalgia; rheumatoid arthritis (RA); mood disorder
        secondary to flare-ups from rheumatoid arthritis; and panic disorder.  (*Id.*)

---

[1] The ALJ's findings are summarized.

15

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 21.)

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except limited to standing and walking no more than six hours in an eight-hour workday and sitting up to six hours in an eight-hour workday. She could have occasionally climbed ramps and stairs, never climbed ladders, ropes, or scaffolds, and occasionally balanced, kneeled, stooped, crouched, and crawled. She was limited to performing frequent handling and fingering, no operation of foot controls, no operation of a motor vehicle during the course of a workday, and avoidance of all exposure to unprotected heights or moving mechanical parts. She should have avoided concentrated exposure to extreme temperatures and humidity. She should have avoided performing jobs that require strict production quotas (i.e.[,] assembly line work), limited to making simple work related decisions, no arbitration, mediation, or responsibility of others, including their safety, as well as managerial responsibilities.  (Tr. 23.)

6.      The claimant was unable to perform any past relevant work through the date last insured.  (Tr. 31.)

7.      The claimant was born in 1966 and was 53 years old, defined as an individual closely approaching advanced age, on the date last insured.  (Tr. 32.)

8.      The claimant has at least a high school education.  (*Id*.)

9.      Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including marker, office helper, and routing clerk.  (Tr. 32-33.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability,

as defined in the Social Security Act, from September 28, 2018, through the date last insured of

December 31, 2019.  (Tr. 33.)

## V.  Plaintiff's Arguments

Ms. O'Connor presents the following arguments for review: [2]

1.  Whether the ALJ's decision at Step Three of the Sequential Evaluation finding Ms. O'Connor did not satisfy the criteria of Listing 14.09 was supported by substantial evidence; and

2.  Whether the ALJ properly evaluated the combination of Ms. O'Connor's symptoms to find her capable of a light work RFC.

(ECF Doc. 6, p. 1.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th

---

[2] On March 29, 2023, the parties submitted a Notice of Narrowed issues, indicating that Ms. O'Connor had agreed to waive any constitutional challenges to the Commissioner's appointment pursuant to *Seila Law LLC v. COnsuper Financial Protection Bureau*, 140 S. Ct. 2183 (2020).  (ECF Doc. 10.)  The Court acknowledges the parties' notice and considers only the two remaining assignments of error raised in Ms. O'Connor's brief.

Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether ALJ's Finding That Ms. O'Connor Did Not Meet Listing 14.09 Was Supported by Substantial Evidence**

Ms. O'Connor argues in her first assignment of error that the ALJ erred in finding she did not meet the requirements of Listing 14.09 because that finding lacked the support of substantial evidence. (ECF Doc. 6, pp. 14-18.) The Commissioner argues in opposition that the ALJ

18

properly considered the criteria of Listing 14.09, and that Ms. O'Connor failed to meet her burden to show that she satisfied all elements of Listing 14.09B.  (ECF Doc. 8, pp. 14-16.)

At Step Three of the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Under this sequential analysis, the claimant retains the burden of proof at Step Three.  *See Walters*, 127 F.3d at 529.  To prove disability, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

"[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)).  An "ALJ should discuss the relevant listing, however, where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Smith-Johnson*, 579 F. App'x at 432 (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)).  To raise a "substantial question," the Court explained "[a] claimant must do more than point to evidence on which the ALJ could have based his finding." *Id*. (citing *Sheeks*, 544 F. App'x at 641-42).  "[T]he claimant must point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing." *Id*.

Ms. O'Connor argues she satisfied the following criteria of Listing 14.09: "persistent inflammation or persistent deformity of one or more major joints of an upper or lower extremity with involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity, and at least two of the constitutional symptoms

or signs." (ECF Doc. 6, pp. 16-17.)  In particular, she contends that her "combination of impairments"—specifically plantar fasciitis / bilateral neuroma of the feet and panic disorder with agoraphobia—involved two or more body systems to at least a moderate level of severity. (*Id.* at p. 17.)  The Commissioner responds that this argument must be rejected because Listing 14.09B required Ms. O'Connor to "demonstrate that her *arthritis resulted* in the involvement of two or more organs/body systems," while "her panic disorder with agoraphobia is both unrelated to her arthritis and is inconsistent with the regulations regarding involvement of the mental health system." (ECF Doc. 8, pp. 15-16 (emphasis in original).)

To meet Listing 14.09B, Ms. O'Connor has the burden to demonstrate inflammatory arthritis as described in Listing 14.00D6 with the following additional features:

> B. Inflammation or deformity in one or more major joints of an upper or a lower extremity with:
>
> 1. Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; and
>
> 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 14.09B.  "Major joints" of the upper and lower extremities include the shoulder, elbow, "wrist and hand together," hips, knees, and "ankle and hindfoot together."  20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 1.00I2, 1.00I3, 14.00C8.  As to the "[i]nvolvement of two or more organs/body systems," the Listings explain that "[e]xtra-articular features of inflammatory arthritis may involve any body system," including the musculoskeletal, ophthalmologic, pulmonary, cardiovascular, renal, hematologic, neurologic, mental, and immune systems.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 14.00D6eiii  Examples of extra-articular features of inflammatory arthritis that involve the mental system include cognitive dysfunction and poor memory.  *Id.*

In finding that Ms. O'Connor did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, the ALJ explained:

> Though the claimant has been diagnosed with rheumatoid arthritis and fibromyalgia, section 14.09 was not met or medically equaled, because the record does not reflect that the claimant's symptoms resulted in an inability to ambulate effectively. They did not result in an inability to perform fine and gross movement effectively. They did not affect two or more organs/body systems. They did not markedly limit one of the following: activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

(Tr. 21 (citing to Tr. 468, 486, 592, 596-97, 600, 644) (emphasis added).)  The Court finds that Ms. O'Connor has not met her burden to show that the ALJ lacked substantial evidence to support this finding.  While Ms. O'Connor's brief identifies two impairments—plantar fasciitis / neuroma of the foot and anxiety disorder—that impacted two body systems, she falls short of demonstrating that either of those impairments were "[e]xtra-articular features of inflammatory arthritis" as contemplated in Listing 14.00D6eiii.  She also fails to identify what major joint(s) of the upper or lower extremities were inflamed or deformed by her inflammatory arthritis.

It is also apparent from a review of the records cited by the ALJ in his analysis of Listing 14.09 that he considered the evidence highlighted by Ms. O'Connor in her listings argument. Those records reflect that Ms. O'Connor complained of fatigue and disabling pain in her extremities, but that her fine motor skills and gait remained normal (Tr. 468, 486, 644), she had appropriate mental status examination findings (Tr. 592, 596-97), and the mental impairments relating to her chronic pain were reported to be well managed with medication (Tr. 600).

Ultimately, Ms. O'Connor has not identified evidence proving that she met all elements of Listing 14.09B, and has therefore failed to meet her burden at Step Three.  *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("It is insufficient that a

claimant comes close to meeting the requirements of a listed impairment."); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").  She has thus failed to prove that the ALJ lacked substantial evidence to support his finding at Step Three that she did not meet Listing 14.09.

For the reasons set forth above, the Court finds Ms. O'Connor has not met her burden to prove that the ALJ erred in finding she did not meet Listing 14.09.  Accordingly, the Court finds the first assignment of error to be without merit.

**C.      Second Assignment of Error: Whether Substantial Evidence Supported the RFC**

In her second assignment of error, Ms. O'Connor argues that the physical RFC adopted by the ALJ lacked the support of substantial evidence because the ALJ: (1) did not adequately analyze fibromyalgia under SSR 12-2p (ECF Doc. 6, pp. 20-21); (2) did not appropriately account for Ms. O'Connor's subjective complaints of pain and fatigue (*id.* at pp. 21-22); and (3) erred in relying on the medical opinions of the state agency medical consultants (*id.* at pp. 23). The Court will address each adequately articulated argument in turn.[3]

**1.      Whether ALJ Adequately Assessed Fibromyalgia under SSR 12-2p**

Ms. O'Connor argues the ALJ failed to comply with the requirements of SSR 12-2p in assessing her fibromyalgia because he "failed to consider the longitudinal record" documenting her difficulties with standing and walking and "the waxing and waning of her symptoms related to rheumatoid arthritis, fibromyalgia, neuroma, and anxiety."  (ECF Doc. 6, pp. 20-21.)  The Commissioner responds that the ALJ detailed medical evidence dating from October 2018

---

[3] Ms. O'Connor raises a number of perfunctory arguments in her brief.  The Court has responded to only those issues with developed argumentation; all others are deemed waived.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("we limit our consideration to the particular points that [Plaintiff] appears to raise in her brief on appeal."); *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation , are deemed waived.").

through June 2020—even though Ms. O'Connor's date last insured was December 31, 2019—and "thoroughly considered the cumulative nature of [Ms. O'Connor]'s fibromyalgia, arthritis, and foot issues and her associated standing and walking limitations."  (ECF Doc. 8, p. 20.)

SSR 12-2p provides guidance on how an ALJ should "develop evidence to establish that a person has a medically determinable impairment of fibromyalgia," and "evaluate fibromyalgia" in the context of a disability claim.  *See* SSR 12-2p, 77 Fed. Reg. 43640-44 (Jul. 25, 2012).  In assessing the RFC of an individual with fibromyalgia, SSR 12-2p provides that the ALJ "will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'"  SSR 12-2p, 77 FR 43640-01.

In arguing that the ALJ failed to consider the longitudinal record and/or the waxing and waning of symptoms, Ms. O'Connor does not identify any specific medical records or findings she asserts the ALJ failed to consider.  (ECF Doc. 6, pp. 20-21.)  Instead, she prefaces the argument with a string of citations to records documenting her problems with standing and walking, and citations to her own testimony regarding her limitations.  (*Id.* at pp. 19-20.)  But a review of the ALJ decision demonstrates that he considered Ms. O'Connor's subjective complaints (Tr. 24), summarized her rheumatology, pain management, and podiatry treatments between November 2018 and January 2020 (Tr. 25-27), and discussed her psychiatric evaluations and treatment visits from April 2019 through June 2020 (Tr. 27-29).  Having considered those records, the ALJ went on to make the following findings:

> After carefully reviewing the entire record, the undersigned concludes that through her date last insured of December 31, 2019, the claimant retained the ability to perform light exertional work with postural, manipulative, and environmental restrictions. The claimant consistently exhibited an independent and normal gait []. She exhibited full strength in her extremities, intact sensation, and symmetrical reflexes []. The undersigned finds she should have never operated foot controls but also notes that her foot pain had been well managed with injections []. The claimant has reported significant fine motor restrictions for which she has been limited to

23

frequent handling and fingering. However, exam findings showed normal fine motor coordination, full motor strength, intact sensation, normal reflexes, and 5/5 grip strength []. This is also consistent with her ability to use a computer, drive a car, prepare meals, and do household chores []. The claimant should have avoided exposure to temperature extremes and humidity, as they may have exacerbated her fibromyalgia and arthritis symptoms. Due to her pain, fatigue, and anxiety, the undersigned finds she should have avoided work around hazards. Finally, the claimant should not have operated a motor vehicle due to her anxiety and would have also been limited to no work requiring strict production quotas and simple work related decisions accounting for lower stress type work as to avoid increased symptomology. A more restrictive residual functional capacity is not consistent with the claimant's treatment history nor the objective medical findings. Her foot pain had been well managed with injections, and her joint pain had improved with Cymbalta []. She had primarily managed her anxiety through outpatient medication management and denied any ongoing depression symptoms [].

(Tr. 29 (citations omitted).)  Thus, the ALJ explained his conclusions regarding Ms. O'Connor's functional capacity with specific reference to her objective clinical findings, her treatments and their effectiveness, and her engagement in specified activities of daily living.  (*Id.*)

Considering the ALJ's discussion and findings, the Court finds Ms. O'Connor has not adequately explained her grounds for arguing that the ALJ did not consider the longitudinal record or the waxing / waning of her symptoms under SSR 12-2p.  This Court's review of the underlying records and the ALJ decision does not fill in that gap.  Accordingly, the Court finds Ms. O'Connor has failed to show the ALJ erred in assessing her fibromyalgia under SSR 12-2p.

**2.      Whether ALJ Appropriately Considered Subjective Complaints**

Ms. O'Connor next argues that the ALJ erred in finding her subjective allegations of pain were not entirely consistent with the medical evidence because the ALJ's finding "was contrary to the evidence in the record."  (ECF Doc. 6, p. 21.)  In support, she points to evidence from her treating sources, her own written statements, and her own testimony.  (*Id.* at pp. 21-22.)  The Commissioner responds that the ALJ properly evaluated Ms. O'Connor's subjective symptoms, and notes that the ALJ's determination is subject to deference.  (ECF Doc. 8, pp. 20-21.)

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); see also 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 24-25), so the discussion will be focused on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ considers objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. 404.1529(c)(3).  Factors relevant to a claimant's symptoms such as pain include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other

factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).

Here, a review of the decision reveals that the ALJ considered the entire record, based his findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed. Reg. 49462, 49467.  Specifically, the ALJ acknowledged that Ms. O'Connor alleged "limitations due to rheumatoid arthritis, widespread joint pain and swelling, anxiety, and hypothyroidism," but concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the objective evidence of record and other evidence in the record[.]" (Tr. 24-25.) As detailed in Section VI.C.1., *supra*, the ALJ acknowledged Ms. O'Connor's specific subjective complaints (Tr. 24), outlined her treatments with rheumatology, pain management, and podiatry throughout the relevant period (Tr. 25-27), described her psychiatric evaluations and mental health treatment records (Tr. 27-29), identified subjective complaints that were considered in determining the RFC, but weighed them against objective findings, treatment outcomes, and activities suggestive of fewer limitations (Tr. 29), identified various activities the ALJ found to be consistent with the RFC (*id.*), and considered the medical opinion evidence (Tr. 29-31).

In support of her argument that the ALJ erred in evaluating her subjective complaints, Ms. O'Connor provides a string of citations to evidence documenting her complaints of "pain related to her feet, rheumatoid arthritis, and fibromyalgia," argues she should have been found disabled based on the medical evidence and her reported pain, and contends that the ALJ committed harmful error by "[f]ailing to account for her pain and fatigue."  (ECF Doc. 6, pp. 21-22.)  As with her prior arguments, Ms. O'Connor fails to identify any specific evidence the ALJ should have—but failed to—consider in analyzing her subjective symptoms, and the Court's

own review of the records and decision does not fill that gap.  Instead, a review of the decision reveals that the ALJ acknowledged Ms. O'Connor's complaints of pain (Tr. 24-27) but found she could perform work at a light exertional RFC in light of: numerous specified unremarkable examination findings; evidence that her foot pain was well managed with injections, her joint pain improved with Cymbalta, and her anxiety was managed with outpatient medication management; and evidence that she participated in activities such as using a computer, driving a car, preparing meals, and performing household chores (Tr. 29).  Ms. O'Connor has failed to show that the ALJ's findings lacked the support of substantial evidence.

Ultimately, Ms. O'Connor is asking this Court to reconsider evidence that was already considered and weighed by the ALJ.  It is not this Court's role to "try the case *de novo*, . . . resolve conflicts in evidence, []or decide questions of credibility."  *Garner*, 745 F.2d at 387.  Instead, this Court may only consider whether the ALJ's findings were supported by substantial evidence.  Indeed, even if substantial evidence supported Ms. O'Connor's interpretation of the evidence, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

For the reasons set forth above, the Court finds the ALJ was supported by substantial evidence in finding Ms. O'Connor's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence of record.

### 3.    Whether ALJ Erred in Finding State Agency Opinions Mostly Persuasive

Finally, Ms. O'Connor argues the ALJ erred in finding the state agency medical opinions "mostly persuasive" when the state agency consultants "limited their analyses to adopting RFC proffered by the prior ALJ decision in September 2018" and "did not consider the evidence submitted for the current application."  (ECF Doc. 6, p. 23.)  The Commissioner responds that

the state agency consultants *did* consider new treatment records from the present application, including records from October 2018 through May 2019, and that the ALJ also considered the medical treatment records subsequent to those opinions in setting the RFC.  (ECF Doc. 8, p. 19.)

As an initial matter, the Court finds Ms. O'Connor's statement that "the reviewer did not consider the evidence submitted for the current application" (ECF Doc. 6, p. 23) to be incorrect. The period under adjudication is September 28, 2018, through December 31, 2019.  (Tr. 20.) The evidence reviewed by the state agency physicians included medical treatment records from October 2018 through May 2019.  (Tr. 136, 139-40, 149, 151-52.)  The state agency reviewers issued their opinions on April 24, 2019, and July 3, 2019.  (Tr. 140, 152.)  Thus, the state agency medical consultants reviewed the most up-to-date medical records available during their review.

The remaining question is whether the ALJ erred in finding the opinions "mostly persuasive" even though the state agency consultants adopted a prior ALJ's RFC.  As a general matter, an ALJ does not err in relying on an "out of date" state agency opinion where he also "considered the medical examinations that occurred after" the opinion was rendered "and took into account any relevant changes in [the claimant]'s condition."  *See McGrew v. Comm'r of Soc. Sec.,* 343 F. App'x 26, 31 (6th Cir. 2009).  The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).

Here, the ALJ made the following findings in support of his conclusion that the opinions of the state agency medical consultants were "mostly persuasive":

> The State agency medical consultants found the claimant could perform light work but could only occasionally climb ramps and stairs []. She could never climb ladders, ropes, or scaffolds, could occasionally balance, kneel, stoop, crouch, and crawl, and could perform frequent bilateral handling and fingering. They indicated she could never operate foot controls, never be required to operate a motor vehicle during the course of a workday, restricted from hazards, such as heights or machinery, and must have avoided concentrated exposure to extreme temperatures and humidity []. <u>The undersigned finds the prior administrative finding to be mostly persuasive. The State agency consultants have disability program knowledge. They described objective evidence to support their residual functional capacity assessment. Their opinion is generally supported by the claimant's physical exam findings and no evidence as to neurological deficits or gait related abnormalities []. It is consistent with her conservative treatment history and her independent daily activities</u>.

(Tr. 30 (citations omitted) (emphasis added).)  Before making these findings, the ALJ discussed Ms. O'Connor's medical treatment throughout the alleged disability period, including treatment occurring after the state agency opinions were rendered.  (Tr. 25-29.)  The ALJ then considered the "disability program knowledge" that supported the opinions of the state agency medical consultants—relevant to supportability—and the physical examination findings, conservative treatment history, and independent daily activities that were consistent with the limitations opined by those consultants—relevant to consistency.  (Tr. 30.)  The ALJ thus "considered the medical examinations that occurred after" the state agency opinions were rendered, "took into account any relevant changes in [Ms. O'Connor]'s condition," *McGrew*, 343 F. App'x at 31, and explained how he considered the supportability and consistency of those opinions.  Ms. O'Connor has failed to show that the ALJ erred or lacked the support of substantial evidence when he found the opinions of the state agency medical consultants mostly persuasive.

For the reasons set forth above, the Court finds the ALJ's assessment of the opinions of the state agency medical consultants was adequately articulated and supported by substantial evidence.  The Court finds Ms. O'Connor's second assignment of error to be without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

February 22, 2024

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge